**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>PARISH CHEMICAL COMPANY, and<br>UINTAH PHARMACEUTICAL<br>CORPORATION, et al.,<br><br>     Defendants. | **MEMORANDUM DECISION AND<br>ORDER APPROVING THE PUBLIC<br>SALE FREE AND CLEAR OF<br>PARISH CHEMICAL PROPERTY,<br>APPROVING RELATED BIDDING AND<br>AUCTION PROCEDURES, AND<br>GRANTING RELATED RELIEF**<br><br>Case No. 2:09-cv-804-CW<br><br>Judge Clark Waddoups |

Currently pending before the Court is the motion by Bret F. Randall, as Trustee ("Trustee") of the PCC Redevelopment Trust (the "Trust"), for an Order (the "Sale Order") approving bidding procedures, an auction, and the sale of the property of the Trust (the "Trust Property") free and clear of liens (the "Sale Motion"). (*See* ECF No. 186.) The Trust holds the former assets of Parish Chemical Company ("PCC") and Uintah Pharmaceutical Corporation ("UPC") (collectively, "Parish Chemical"), pursuant to the Trust Agreement dated November 12, 2012 (the "Trust Agreement"), which is Appendix A to the Consent Decree entered by the Court in this action on March 26, 2013 as ECF No. 180 (the "Consent Decree"). The legal description and a more detailed description of the Trust Property is attached as **Attachment 1**.

RWI Investments L.C. ("RWI") owns property adjoining the Trust Property, which it currently leases to a drywall business, and also holds an easement on the Trust Property. (*See* ECF No. 189, pp. 5-6.) RWI objects to the sale of the Trust Property free and clear of its easement because RWI and its lessee would have to relocate the business at "significant expense." (*Id.* at 7.) In its objection, RWI argues that (1) the United States' Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") lien on the Trust

Property was not perfected under Utah law and thus is junior to RWI's easement interest, and (2) the court lacks authority to extinguish RWI's easement in these circumstances. (*See id.*) After a hearing on the Sale Motion and RWI's objections, the court sought supplemental briefing on two issues: (1) whether CERCLA preempts state lien filing requirements and (2) whether the court has authority to extinguish RWI's property interest in this proceeding. (*See* ECF No. 194.) After the United States, the Trustee, and RWI each submitted supplemental briefing, (*see* ECF Nos. 198, 199, 200, 201), the court took the Sale Motion and RWI's objections under advisement.

After consideration of the Sale Motion and RWI's objections, oral arguments and supplemental briefing, relevant case law, and the record in this case, the court now **GRANTS** the Trustee's Sale Motion, (ECF No. 186). The court first outlines the factual background relevant to its decision, and then addresses each of RWI's objections to the sale free and clear of its interest. The court ultimately concludes that: (1) the United States' lien substantially and substantively complied with Utah lien notice requirements and RWI was on constructive notice of the lien when it secured its easement, such that the lien is superior to the easement; and (2) the court has authority to order the sale of the Property free and clear, migrating RWI's interest to the proceeds of the sale, if any exist after the United States' lien is satisfied.

## BACKGROUND

### 1. The Trust Property & CERCLA Lien

On July 16, 1980, the United States Steel Corporation conveyed the property now constituting the Trust Property to Parish Chemical Company (PCC). In 1981, PCC changed its name to Geneva Chemical Company and quitclaimed the Trust Property to Uintah Pharmaceutical Corporation (UPC). (United States' Reply at 3; *see* Ex. A, ECF No. 193-1.)

Based on these transactions, the Environmental Protection Agency (EPA) determined that UPC owned the Trust Property at the time the EPA was preparing a CERCLA Lien record for the Property. On February 19, 2009, the EPA sent UPC a letter entitled Notice of Potential Liability and Intent to Perfect a Superfund Lien. (Ex. C, pp. 3-15, ECF No. 193-3.) Because UPC previously had been involuntarily dissolved by the State of Utah, the EPA sent the notice not only to UPC's Registered Agent at the Property address, but also to the UPC President and the Director of the Utah Division of Corporations and Commercial Code (UDCCC), in accordance with Utah law. (*Id.* at 4.) Along with the names and addresses associated with UPC and UDCCC, the Notice included the precise legal description of the property on which the lien would arise, an explanation of the basis of the lien, and the address of the EPA's regional enforcement officials handling the matter. (*Id.* at 3-7.) The Notice included other pertinent information, such as descriptions of the relevant CERCLA provisions providing for the lien and its duration; explanation of the owner's opportunity to contest the lien record with the EPA; and notation of the certified mailing article numbers for each recipient's address. (*Id.*)

On March 12, 2009, the EPA filed the Notice of Federal Lien with the Utah County Recorder. (Ex. C, pp. 17-23, ECF No. 193-3.) The Notice includes UPC's name and address; the precise legal description of the property; an explanation of the basis of the lien, with citation to relevant CERCLA provisions; the names and address of the EPA's regional enforcement officials; and the Utah County Recorder's stamp with the date of the lien filing. (*Id.*)

On April 3, 2009, the EPA sent UPC a letter notifying it of the perfection of the CERCLA Lien by recording the Notice of Federal Lien with the Utah County Recorder on March 12, 2009. (Ex. C, pp. 25-38, ECF No. 193-3.) This letter contained similar information as in the February notice and attached the recorded Notice of Federal Lien. (*See id.* at 25-30.)

In February 2010, UPC conveyed the Property back to PCC by a Special Warranty Deed. (Reply at 4; *see* Ex. D, ECF No. 193-4.) On July 1, 2011, nearly two years after EPA recorded its CERCLA Lien, PCC and RWI executed an Option Agreement for Perpetual Easement, and then a Grant of Perpetual Easement, which was recorded on October 14, 2011. (Exs. B & C to Sale Mot., ECF No. 186.)

       2.   *The Current Proceeding*

The United States filed this lawsuit against PCC and UPC on September 8, 2009, a few months after it filed its Notice of Federal Lien. The United States sued Parish Chemical (PCC and UPC, collectively) for releases and threatened releases of hazardous substances on the Trust Property and violations under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* ("RCRA"), and to recover the costs incurred in responding to the release or threatened release of hazardous substances under Section 107 of CERCLA, 42 U.S.C. § 9607. (*See* Compl., ECF No. 2.) The court entered a preliminary injunction in 2011 and appointed a receiver in June 2012. (*See* ECF Nos. 59, 133, 135.) On March 26, 2013, the Court approved the Consent Decree between the EPA and the receiver, on behalf of Parish Chemical, which provided for the resolution of the CERCLA claims brought by the EPA and for the creation of the Trust for the benefit of the EPA. The court appointed Bret F. Randall, the movant here, as Trustee. (*See* ECF Nos. 179, 180.)

In September 2012, RWI sought to intervene in this action to assert an interest arising from agreements with the Utah Department of Transportation (UDOT) and Parish Chemical related to UDOT's Geneva Road Widening Project, which took portions of RWI and Parish Chemical's adjoining properties. (*See* ECF Nos. 149, 150.) The facts RWI attests to in its motion speak to its knowledge of the EPA's lien on the Parish Chemical property and RWI's negotiation

of the easement in the shadow of this lien. For example, the United States noted in opposing intervention that UDOT substantially compensated RWI to address its losses from the road-widening, to the tune of $800,000. (*See* ECF No. 157, p. 4 & Exs.) This sum specifically provided for the loss of parking and to allow for the razing of one building on RWI's property so that a parking lot could be built for the remaining building. (*Id.* at 4.) It also included sums to fund RWI's move to an alternate location. (*Id.*)

Instead of relocating, RWI stated in its motion that it purchased a "perpetual easement from Parish Chemical on a segment of the Parish Chemical property directly adjoining [RWI's] property." (ECF No. 150, p. 2, ¶ 4.) RWI also stated that "[a] Phase II environmental report was required in *order to close the easement* agreement between [RWI] and Parish Chemical and in order for UDOT to provide permanent fencing and parking on that portion of the Parish Chemical property." (*Id.* ¶ 6 (emphasis added).) This was because the EPA "required UDOT to obtain a Phase II environmental report *to ensure the property UDOT condemned was not contaminated prior to the EPA agreeing to release its lien on title* to UDOT." (*Id.* ¶ 7 (emphasis added).) RWI, UDOT, and Parish Chemical entered into agreements that would reimburse RWI for funding the Phase II environmental report and for permanent fencing and parking. (*Id.* at 3, ¶¶ 8-9.) Ultimately, RWI withdrew its motion to intervene before any decision by this court was rendered. (ECF No. 162.)

Now, after the CERCLA removal action has been completed on the Parish Chemical property (the Trust Property), the Trustee has moved the court for an order of sale of the Trust Property "free and clear" of RWI's easement interest, (ECF No. 186), and RWI has objected, (ECF No. 189). The Trustee notes that, "[a]t this time, the Trustee has a duty to obtain the greatest value possible for the Trust Property to maximize recovery of the EPA's removal costs."

(ECF No. 186, p. 6.) The Trustee also notes that RWI's easement, "because it is not subject to demolition liabilities, represents a significant share of the value of the Trust Property." (*Id.* at 3.)

## ANALYSIS

Considering RWI's objections in light of this case history, the court concludes, first, that it need not address whether CERCLA preempts state law on lien filing requirements because the EPA's Notice of Federal Lien complied with Utah law in substance and meaning. Additionally, the court finds that RWI had constructive notice of the lien at the time it secured its easement on the Trust Property. Second, the court finds that it has authority to approve the sale of the Trust Property free and clear of RWI's easement interest. Therefore, the court approves the Trustee's Sale Motion and procedures therein, as further described below.

**I.     The CERCLA Lien substantially and substantively complies with Utah law.**

The United States secured a federal lien under CERCLA to recover its costs in this removal action. *See* 42 U.S.C. § 9607(*l*) ("Federal lien"). CERCLA Section 107(*l*)(1), which describes the lien generally, provides that:

> [a]ll costs and damages for which a person is liable to the United States under subsection (a) of this section . . . shall constitute a lien in favor of the United States upon all real property which–
>
> > (A) belong to such person; and
>
> > (B) are subject to or affected by a removal or remedial action.

42 U.S.C. § 9607(*l*)(1). Section 107(*l*)(2) addresses when the statutory lien arises and its duration:

> The lien imposed by this subsection shall arise at the later of the following:
>
> (A) The time costs are first incurred by the United States with respect to the response action under this chapter.

(B) The time that the person referred to in paragraph 1 is provided (by certified or registered mail) written notice of potential liability.

Such lien shall continue until the liability for the costs (or a judgment against the person arising out of such liability) is satisfied or becomes unenforceable through operation of the statute of limitations provided in section 9613 of this title.

*Id.* § 9607(*l*)(2). Finally, section 107(*l*)(3), entitled "Notice and validity," addresses the rights of third parties that may be affected by the federal statutory lien. Because the parties disagree on the provision's interpretation, the court quotes it in full:

> The lien imposed by this subsection shall be subject to the rights of any purchaser, holder of a security interest, or judgment lien creditor whose interest is perfected under applicable State law before notice of the lien has been filed in the appropriate office within the State (or county or other governmental subdivision), as designated by State law, in which the real property subject to the lien is located. Any such purchaser, holder of a security interest, or judgment lien creditor shall be afforded the same protections against the lien imposed by this subsection as are afforded under State law against a judgment lien which arises out of an unsecured obligation and which arises as of the time of the filing of the notice of the lien imposed by this subsection. If the State has not by law designated one office for the receipt of such notices of liens, the notice shall be filed in the office of the clerk of the United States district court for the district in which the real property is located. For purposes of this subsection, the terms "purchaser" and "security interest" shall have the definitions provided under section 6323(h) of Title 26.

*Id.* § 9607(*l*)(3). The parties do not dispute, but rather assume, that RWI's easement has been perfected under applicable Utah law; therefore, RWI contends, if the United States' lien was not perfected under Utah law, its lien is inferior to RWI's easement.

In interpreting section 107(*l*)(3)'s effect on the superiority of the United States' lien over state-perfected interests, the parties disagree about the meaning of the language stating "[t]he lien imposed by this subsection shall be subject to the rights of any purchaser . . . whose interest is perfected under applicable State law before notice of the lien has been filed in the appropriate office within the State (or county or other governmental subdivision), *as designated by State law*, in which the real property subject to the lien is located." *Id.* § 9607(*l*)(3) (emphasis added). The

United States interprets this provision to mean that it must file its lien notice in the *location* designated by state law, but that the *contents* of the notice need not necessarily adhere to state law. RWI interprets this provision to mean that CERCLA lien notices must comply with state law as to *both* content *and* recording location.

Viewed in context of the full language of the provision, the court believes that the more natural reading supports the United States' position that the provision only deals with the filing of the lien notice in the location designated by state law. The court, however, recognizes the ambiguity in the statutory language. As RWI points out, both interpretations may be reasonable, particularly because CERLA does not lay out its own lien filing requirements.

But the court need not resolve the statutory ambiguity in this case, or address the underlying question of whether federal law would preempt state lien notice requirements, because the court finds the United States' Notice of Federal Lien documents comply with the purposes and substance of the Utah lien notice requirements.[1]

The Utah notice requirements for lien filings in effect at the time of this lien filing state, in relevant part:

> (1) A lien claimant or the lien claimant's agent shall send by certified mail a written copy of the notice of lien to the last-known address of the person against whom the notice of lien is filed no later than 30 days after the day on which a lien claimant or the lien claimant's authorized agent files a notice of lien meeting the requirements of Subsection (2):
>     (a) for recordation with:

---

[1] RWI argues that the court should strike or at least disregard the United States' arguments regarding the Utah lien notice statutory provisions because it supposedly conceded at the motion hearing that the lien did not meet state law requirements. (*See* ECF No. 201.) The court does not find that the United States' clearly conceded this point and will consider the United States' arguments in its supplemental briefing. More importantly, the court did not make any ruling at the hearing resolving the issues presented by the Sale Motion, despite RWI's suggestions to the contrary, and the court finds the United States' arguments regarding the Utah lien notice statute well-taken. The court will not penalize the United States for further briefing an issue that moots the preemption question.

> > (i) a county recorder;
> > (ii) a county clerk; or
> > (iii) a clerk of the court; or
>
> (b) in the case of a lien on an aircraft under Section 38–13–201, with the Federal Aviation Administration.
>
> (2) The notice of lien described in Subsection (1) shall contain the following information:
>
> > (a) the name and address of the person against whom the lien is filed;
> > (b)(i) a statement that certain property owned by the person against whom the lien is filed is subject to a lien;
> > > (ii) the amount of the judgment, settlement, or compromise if the lien is based on a charge against or interest in a judgment, settlement, or compromise; or
> > > (iii) the amount of state taxes owed;
> > (c) the article number contained on the certified mail receipt;
> > (d) the date the notice of lien was filed; and
> > (e) the name and address of the lien claimant.

Utah Code Ann. § 38–12–102(1) & (2). On the whole, these statutory requirements, and other provisions in Chapter 12, appear primarily concerned with notice to the person against whom the notice of lien is filed. For example, the subsequent section, § 38–12–103, states that noncompliance with the notice requirements in section 102 may result in statutory damages accruing to "the person against whom the notice of lien was filed." *Id.* § 38–12–103(2). It also specifically notes that noncompliance does not invalidate the lien. *Id.* § 38–12–103(3). Parish Chemical, as the owner of the Trust Property against whom the lien arose, has not challenged the validity or effectiveness of the lien notice. Thus, the question arises of whether RWI truly has standing to collaterally attack the lien notice, since RWI has suffered no harm by the United States' alleged failure to strictly comply with Utah lien notice requirements and since notice was clearly effective to "the entity against whom the notice of lien was filed." Nonetheless, because RWI challenges the lien's priority over its easement and because RWI's interest is impacted by the approval of this Sale Order, the court will address RWI's challenge to the lien notice.

RWI has conceded that the Notice of Federal Lien complies with each requirement of the Utah statutory lien notice requirements except for section (2), subsections (c)-(e). (Suppl. Br. at 11 n.2, ECF No. 201.) Upon review, the court finds that the Notice of Federal Lien, on its face, satisfies at least subsections (d) and (e): per subsection (d), the Notice of Federal Lien contains the date of filing in the recorder's stamp and, per subsection (e), the Notice states the name and address of the lien claimant (i.e., the EPA, Technical Enforcement Program, Region 8) and names two regional enforcement officers.[2] (*See* ECF No. 186, Ex. A (Notice of Federal Lien); ECF No. 193-3, Ex. C, pp. 17-19 (same).)

As to subsection (c), RWI complains that the United States did not include the certified mailing article number on the Notice of Federal Lien itself, but rather in the April 2009 notice letter sent to Parish Chemical. The April 2009 notice letter features the article number conspicuously on the front and attaches a copy of the recorded Notice of Federal Lien. (ECF No. 193-3, Ex. C, p. 25.) If the letter is considered part of the Notice, all statutory requirements are satisfied. RWI presents an affidavit explaining how the certified mailing article number can easily be printed on the notice of lien before recording, but the court finds the EPA's placement of the certified mailing article number on a notice letter sent to the owner of the property against whom the lien arose within 30 days of the notice of lien filing substantially complied with the statute.[3]

---

[2] RWI makes convoluted arguments about why these subsections were not satisfied, but the court finds these arguments baseless. The EPA's regional address and relevant officers are present on the Notice. And the fact that the date on the mailing certificate attached to the Notice shows a date prior to the filing date in the recorder's stamp does nothing to change the presence of the filing date on the Notice.

[3] The March 2009 Notice, Recorded Notice of Federal Lien, and April 2009 Notice—culled from the lengthy Lien Filing Record the EPA complied in this case—also track the requirements of the EPA's 1987 Guidance and 1993 Supplemental Guidance on Superfund Liens. (*See* ECF Nos. 189-1, Ex. G (1987 Guidance) & 193-7, Ex. F (1993 Guidance).) The 1987 Guidance notes that

Even if the court were to ignore the full record of notice in this case and focus only on the fact that certified mailing article number was not present on the recorded Notice of Federal Lien itself, the court still finds the substantive and beneficial purposes of the lien notice statute entirely fulfilled in these circumstances.

Utah's recording statutes serve "to protect the purchaser's interest against the asserted interest of any third parties, and to inform third parties of the existence of pre-existing encumbrances on the property." *Fed. Deposit Ins. Corp. v. Taylor*, 2011 UT App 416, ¶ 23, 267 P.3d 949 (quoting *Horman v. Clark*, 744 P.2d 1014, 1016 (Utah Ct. App. 1987)). The court finds these statutory purposes were met here because RWI had at least constructive notice of the CERCLA lien and bargained for a property interest that was clouded by the lien.[4]

"Constructive notice is 'both (1) record notice which results from a record or which is imputed by the recording statutes, and (2) inquiry notice which is presumed because of the fact that a person has knowledge of certain facts which should impart to him, or lead him to,

---

the EPA "should refer to State requirements for filing notice of the lien" and then includes a list of items the lien notice should generally include, which replicates most of the Utah lien notice requirements. The Notice of Federal Lien here complies with the 1987 Guidance. (*Compare* ECF No. 189-1, p. 67, with ECF No. 193-3, pp. 1-38.) The Notice of Federal Lien also closely mirrors the example lien notice attached to the 1987 Guidance. (*Compare* ECF No. 189-1, p. 70, with ECF No. 193-3, pp. 17-19.) But the guidance documents also state that they are "intended solely as guidance for employees," "do not constitute rulemaking," and "may not be relied upon to create a right or a benefit, substantive or procedural, enforceable at law or in equity, by any person." (ECF No. 189-1, p. 69; ECF No. 193-7, p. 11.) Therefore, while the EPA's compliance with its internal guidance corroborates its compliance with notice filing requirements generally, such compliance is not dispositive.

[4] The case record strongly suggests RWI also had actual notice of the lien, particularly where RWI acknowledged the lien's existence during its negotiations around the easement in its motion to intervene. The court could easily conclude that RWI was in fact told about or aware of the lien on the Parish Chemical property during its negotiations with UDOT related to the February 2011 condemnation proceeding, and prior to its purchase of the easement from Parish Chemical. However, because RWI withdrew its intervention motion, and because the parties present no additional facts attesting to RWI's knowledge during this time, the court is not required to find that RWI had actual notice of the lien.

knowledge of the ultimate fact.'" *Pierucci v. Pierucci*, 2014 UT App 163, ¶ 18, 331 P.3d 7, 13–14 (quoting *Taylor*, 2011 UT App 416, ¶ 36). In this case, the court finds RWI had both record and inquiry notice of the CERLCA lien on the Trust Property.

Utah Code Ann. § 57-3-102(1) provides that documents "from the time of recording with the appropriate county recorder, impart notice to all persons of their contents." More specifically, "Utah law presumes that because documents properly filed with a county recorder are available for inspection by the general public, every person has the ability to examine these documents and thus has notice of the contents in these documents." *In re Hiseman*, 330 B.R. 251, 256 (Bankr. D. Utah 2005). The CERCLA lien was recorded and appears in title reports. (*See* ECF No. 193-5, Ex. E (title report for Trust Property)). Thus, RWI had constructive notice of the lien due to its recording in the Trust Property's chain of title.

RWI also had inquiry notice of the lien. Inquiry notice arises from the reality that

[a]n individual who knows, or should know, about a fact suggesting a problem with the title to his property cannot avoid the problem by burying his head in the sand. Utah law therefore presumes that the individual has notice of all the facts which would result from a reasonable investigation of the situation.

*Hiseman*, 330 B.R. at 256. The United States held a CERCLA lien on the Trust Property due to the costs associated with the removal action for which Parish Chemical was liable. Others dealing with Parish Chemical, including UDOT, were aware of this lien during the relevant time. Both RWI and Parish Chemical negotiated with UDOT to receive compensation for the road-widening project. Meanwhile, UDOT negotiated with EPA regarding release of its lien on Parish Chemical's property, and RWI apparently advanced funds for an environmental study the EPA required on the Parish Chemical property *before* the easement agreement could close. Certainly, these interactions would have alerted a reasonable person that further investigation into the property was warranted. *See Pioneer Builders Co. of Nevada v. K D A Corp.*, 2012 UT 74, ¶ 28,

292 P.3d 672, 680 ("[W]e have charged subsequent purchasers with constructive notice of unrecorded interests when the purchaser's observations, together with other available information, would have alerted a reasonable person that further investigation was warranted."). At the time RWI purchased the easement, the United States held, and claimed to hold, a CERCLA lien on the property. RWI's due diligence, or lack thereof, in investigating its purchase of the easement would have revealed the existence of the CERCLA lien recorded in the property's chain of title. Thus, the recorded Notice of Federal Lien fulfilled the purpose of Utah's statutory notice requirements to inform third parties of the existence of pre-existing or competing encumbrances.

RWI argues that "[i]f the certified mail number is not included on the notice of lien, it is impossible for third parties to verify whether the notice of lien was timely sent to the property owner such that it can be enforced." (ECF No. 201, p. 13.)[5] Disregarding, once again, the standing issues evident in this line of argument, the court finds it unimpressive. RWI was on record and inquiry notice of the lien; it could have easily reached out to Parish Chemical, with whom it was already doing business, to confirm the existence and enforceability of the CERCLA lien.

Despite constructive notice of the lien in the public record and from the circumstances, RWI elected to negotiate the easement running over the Trust Property. Even if, upon observation, the recorded Notice of Federal Lien failed to comply with one Utah statutory lien notice requirement—though it complied in all other respects, it clearly provided notice to the

_____

[5] Of course, recording statutes do not impact the validity of conveyances or property interests. *See Horman*, 744 P.2d at 1016. Thus, purchasers can establish the validity of conveyances "independent of the recording statutes," and valid conveyances "will be effective as against any competing claims." *Salt Lake Cty. v. Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 18, 89 P.3d 155, 159. RWI does not challenge the validity of the lien here, simply its priority status over RWI's easement.

entity against whom the lien arose, and its contents clearly showed the Trust Property was encumbered—RWI cannot be said to have purchased the easement in good faith due to its constructive notice of the lien. *Cf.* Utah Code Ann. § 57–3–103 (providing that an unrecorded document is void against a subsequent purchaser who "purchased the property in good faith and for a valuable consideration" and whose "document is first duly recorded"). RWI's easement does not benefit from good faith or bona fide purchaser status because RWI purchased the easement on notice of the CERCLA lien and the attendant risks associated with such an encumbrance on the property. *See, e.g.*, *Carr v. Oaktree Apartments*, 46 So.3d 793, 797 (La. Ct. App. 2010) ("Where a recorded instrument has language that fairly puts a third person on inquiry as to the title and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts, he is to be considered as having bought at his own peril." (quoting *Voelkel v. Harrison*, 572 So.2d 724, 727 (La. Ct. App. 1990))).

In these circumstances, the court finds the United States' CERCLA lien substantially and substantively complied with Utah's statutory lien notice requirements and, therefore, is superior to RWI's later-acquired easement interest. Moreover, the court finds that even if the Notice of Federal Lien failed to fulfill an element of the statute, RWI's interest would not have priority over the United States' lien because it was on notice of the recorded CERCLA lien when it purchased its easement, and thus took the easement subject to the risks inherent in such a lien.

## II.   The Court has Equitable Authority to Grant the Sale Free and Clear.

Generally speaking, a court may order the sale of property over which it has jurisdiction "upon such terms and conditions as the court directs." 28 U.S.C. § 2001(a).

Here, RWI argues that the court's authority to order the sale "free and clear" of RWI's easement is limited to only "appropriate circumstances." (*See* ECF No. 200.) RWI contends that

only two possible circumstances would be appropriate for the court to exercise its authority to order this sale free and clear: first, where "there is a reasonable prospect that a surplus will be left for general creditors," *Seaboard*, 21 F.2d at 416, and, second, in five scenarios outlined by the bankruptcy code whereupon a trustee may sell a debtor's assets "free and clear" of any property interests. *See* 11 U.S.C. § 363(f). These five scenarios are:

(1) an applicable non-bankruptcy law permits such a sale,
(2) the entity at issue consents,
(3) the interest is a lien and the property's selling price is greater than the aggregate value of all liens on such property,
(4) the interest is in a bona fide dispute, or
(5) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*Id.* § 363(f).

Of these "appropriate circumstances" (at common law and in bankruptcy), RWI contends that none are present in this case and, therefore, the court may not exercise its authority to order this sale free and clear. (ECF No. 200, pp. 7-8.) RWI makes several inconsistent arguments here. RWI first claims that there is no reasonable prospect that a surplus will be left for it to be paid the value of its easement interest after the United States' recoups its lien, which substantially exceeds the minimum sale price currently set. (*See id.* at 8 n.2.) But then RWI contends that its easement cannot be valued at all because easements are fundamentally different from liens or other claims for a debt or obligation, and thus RWI could not be compelled to accept monetary satisfaction of the easement in another proceeding, as 11 U.S.C. § 363(f)(5) suggests. Relatedly, RWI argues that it cannot be considered a "creditor" under the bankruptcy code because an easement is a right-of-way/right-to-use, not a debt or a claim. RWI insists that it would be "extremely difficult, if not impossible" to value the easement because "there is no underlying

debt owed to an easement holder," and thus the easement would have to be valued in some other way. (*See* ECF No. 200, pp. 8-12.)

As an initial matter, while 11 U.S.C. § 363 ("Use, sale, or lease of property") outlines useful considerations for equity courts contemplating sales of receivership property free of interests, this sale is not undertaken pursuant to Section 363 and the bankruptcy code is not binding on this court. Therefore, the court does not analyze this case under that section.[6]

Additionally, RWI cites no authority for the proposition that an easement—because it is a right to use or control property of a subservient estate rather than a legal claim for payment or debt from that estate—cannot be valued. The parties certainly valued the easement during their negotiation of the option agreement in 2011. A savvy bargainer might have accounted for the incremental value to RWI for not having to relocate its lessee's business, or for the diminution in the value of the property where the easement would run owing to the CERCLA lien. RWI has received the value of its easement for the past six years. Simply because RWI cannot reference some debt Parish Chemical owes it, as can be done with the CERLA lien, does not mean that RWI cannot use other measures to quantify its property interest. In the takings context, for example, easements have long been understood to be protected property rights subject to just compensation, like any other tangible or intangible property interest. *See, e.g.*, *Colman v. Utah State Land Bd.*, 795 P.2d 622, 625 (Utah 1990) (noting that "[i]t has always been accepted in this state that even an implied easement is a property interest protectible under article I, section 22

---

[6] Moreover, considering the breadth of the court's equitable power, the court remains doubtful that the two circumstances to which RWI points are the *only* instances in which this court can exercise discretion to order a sale free and clear of interests. *See United States v. Gibas*, No. 2:06-cv-100-BSJ, 2007 WL 1448649, at *2 (D. Utah May 11, 2007) (unpublished) ("The Court has broad powers and wide discretion to determine the appropriate relief to be granted in an equity Receivership." (citations omitted)). This is particularly so where one of the appropriate circumstances cited—the bankruptcy code—can only be considered persuasive in a non-bankruptcy proceeding.

[the Utah takings clause]"); *Dooly Block v. Salt Lake Rapid Transit Co.*, 33 P. 229, 231–32 (Utah 1893) (noting that a property owner holds an appurtenant easement to access the street in front of its premises for which the owner "cannot be deprived without due compensation"). *See also In re Jurgielewicz Duck Farm*, No. 8-10-70231-478, 2010 WL 2025503, at *7 (Bankr. E.D.N.Y. May 20, 2010) (unpublished) (collecting cases finding that a restriction or negative covenant on land was a compensable property right). The Utah Supreme Court has affirmed the principle, articulated many times by the United States Supreme Court, that "the intangible character of property alone does not preclude compensation for it." *Bagford v. Ephraim City*, 904 P.2d 1095, 1097–99 (Utah 1995). Significantly, RWI presents no facts upon which the court could conclude that this easement would be "extremely difficult" to value, or that the easement could not be relocated, or even that relocation costs would, in fact or estimation, be substantial. RWI merely asserts these obstacles with no factual detail to support them.

Having dispatched these arguments, the court turns to whether appropriate circumstances exist for it to order the sale of the Trust Property free and clear of RWI's interest. In these circumstances, the court finds it equitable and appropriate to order the sale free and clear of RWI's easement and to transfer RWI's easement interest to the proceeds of the sale in the same order of priority in which it currently stands.

The court's authority to order the relief requested here—sale of the Trust Property free and clear of RWI's junior easement interest—is located in the court's general equitable power to order sales of property within its jurisdiction on terms ordered by the court. *See Mellen v. Moline Malleable Iron Works*, 131 U.S. 352, 367 (1889) (observing that "the removal of alleged liens or incumbrances upon property, the closing up of the affairs of insolvent corporations, and the administration and distribution of trust funds are subjects over which courts of equity have

general jurisdiction"). The court clearly possesses the authority to order the sale of the Trust Property "free of all encumbrances" and to order that RWI's easement interest be transferred to the proceeds of the sale. *See Van Huffel v. Harkelrode*, 284 U.S. 225, 227 (1931) (declaring that the power to sell property "free from incumbrances" has "long been exercised by federal courts sitting in equity when ordering sales by receivers or on foreclosure"); *Seaboard Nat. Bank v. Rogers Milk Prod. Co.*, 21 F.2d 414, 416 (2d Cir. 1927) (observing that "[t]here is no doubt of the power of a court of equity under proper circumstances to sell property free of liens, transferring the lien to the proceeds"). *See also* Annotation, *Power of court to authorize or direct receiver (or trustee in bankruptcy) to sell property free from liens*, 120 A.L.R. 921 (1939, with supplement through 2016).

As a general rule, this equitable power should not be exercised "unless there is a reasonable prospect that a surplus will be left for general creditors." *Seaboard*, 21 F.2d at 416. *See Stock Bldg. Supply, LLC v. Crosswinds Communities, Inc.*, 893 N.W.2d 165, 174 (Mich. Ct. App. 2016) (collecting state cases supporting "the proposition that a trial court should not authorize the sale of property free and clear of all liens unless the proceeds of the sale would be applied to the liens"). But as Judge Learned Hand later acknowledged, this rule is not necessarily "rigid":

> We have no doubt that the power [to order a sale free and clear] exists; the question is only as to the propriety of, and the proper conditions upon, its exercise. It is quite true, although there is perhaps no rigid rule about it, that ordinarily a court will not sell property free of liens unless it can see that there is a substantial equity to be preserved.

*Spreckels v. Spreckels Sugar Corp.*, 79 F.2d 332, 334 (2d Cir. 1935) (describing equity courts and bankruptcy courts' power to sell property free of liens, including tax liens). Shortly after *Spreckels*, a case in the Utah Supreme Court presented this very rule and, though the Court had

"no occasion" to adopt it in that case, the Court noted that "[t]he rule wherever adopted has been held to be discretionary." *Chapman v. Schiller*, 95 Utah 514, 83 P.2d 249, 252 (1938).

Thus, courts have ordered the sale of property free of interests and encumbrances even where the effect is to extinguish junior property interests transferred to the proceeds because no proceeds remain after the satisfaction of superior interests. *See Van Huffel*, 284 U.S. at 227 (upholding a bankruptcy court order directing "that the property be sold free of all incumbrances; and that the rights of all lienholders be transferred to the proceeds of the sale" even though all proceeds of the sale went toward satisfaction of a prior mortgage interest, leaving a state tax lien unpaid); *Pennant Mgmt., Inc. v. First Farmers Fin.*, LLC, No. 14-CV-7581, 2015 WL 4511337, at *5 (N.D. Ill. July 24, 2015) (unpublished) (noting that "'[w]here the asserted liens are disputed and other good cause exists,' the Court may authorize a sale of real property free and clear of liens despite asserted lien amounts that are greater than the sale price") (quoting *Coulter v. Blieden*, 104 F.2d 29, 32 (8th Cir. 1939)). Indeed, in *Spreckels*, Judge Hand affirmed a district court's decree directing the sale of property free and clear of city tax liens (which were transferred to the proceeds) even though the United States held a prior lien on the property that would have swallowed the entirety of the proceeds. 79 F.2d at 334–35. Judge Hand remarked that:

> it is true that the position of the city has been prejudiced, though the difference is not so substantial as appears, or grave enough, we think, to upset the [district] judge's decision. In so far as it is not a prior lienor, that is, if the liens of the United States and the State of New York come before it—or perhaps even some of the expenses of administration—it cannot hope to realize on more than the equity which will remain after these are paid; it is like any other junior lienor.

*Id.* at 335. In light of this case law, the court finds that it can order the sale of property free and clear, even if a junior interest holder would not receive satisfaction of its interest, where good cause and equitable circumstances exist to justify such a sale.

Though it is not clear on this record whether the proceeds from the sale will be sufficient to compensate RWI for the loss of its easement interest, the court finds the equities here weigh against RWI's position. RWI negotiated its easement on the Trust Property with notice of the CERCLA lien, which has priority, and did so despite also negotiating with UDOT for relocation expenses around the same time. RWI appears to have had other options, but chose to secure an easement interest on already-encumbered property. It cannot now claim substantial prejudice that the United States seeks to recoup on its lien at the completion of its CERCLA action.

The court also finds that RWI has received sufficient due process throughout this proceeding. RWI received notice of the Sale Motion and objection period, objected and argued its objections to the court at the motion hearing, filed supplemental briefing on its arguments, and has now obtained the court's resolution of its objections in this memorandum decision and order. RWI has received ample notice and process in this matter. *Cf. Seaboard*, 21 F.2d at 418 ("The court has possession of the fund, and with possession went the power to disburse it . . . provided the parties in interest were before the court. This could be accomplished by notice."); *Chapman*, 83 P.2d at 253 ("The same notice that makes [the bondholders] parties to the proceeding for the purpose of ordering a sale free from their liens also suffices for making them parties to the proceeding for all purposes of administration of the property, and especially for the purpose of ordering the sale.").

In conclusion, the court has heard from all parties in interest and now exercises its inherent authority and discretion to order the sale of the Trust Property free and clear of RWI's easement. The court remits RWI's easement interest to the proceeds of the sale in the order of priority in which it now stands, i.e., subject to the United States' satisfaction of its superior lien.

# # #

Upon resolution of the objections above, the court makes the following findings of fact and conclusions of law:

A.     This Court has jurisdiction pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), Sections 107(a), 107(l), and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a), (l), and 113(b).  Furthermore, this Court retained continuing jurisdiction over matters involving the Consent Decree, pursuant to Paragraph 47, providing:  "This Court shall retain jurisdiction over this matter for the purpose of interpreting and enforcing the terms of this Consent Decree."  Finally, pursuant to the Trust Agreement, Section 10.03, this Court also retained continuing jurisdiction over matters involving the Trust, as follows:  "This Trust shall be enforceable in the United States District Court for the State of Utah, which has continuing jurisdiction over the Consent Decree. The validity, interpretation, and performance of this Trust shall be governed by the laws of the State of Utah."  Venue is proper in this district pursuant to the provisions cited in Paragraph 3 of the Complaint.

B.     Pursuant to the Trust Agreement, among other responsibilities, the Trustee is required to sell or lease the Trust Property.  The Court's Order approving appointment of a receiver in this case contemplates the Court's approval of such a sale:

> Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

Order Appointing Receiver, Imposing Asset Freeze and Prohibiting Destruction of Documents entered June 20, 2012 (ECF No. 135), at ¶ 40 (the "Receiver Order").  At this point in time, the Trustee is, in effect, standing in the shoes of the Receiver.

C.     Good and sufficient notice of the motion and the relief sought herein has been given and no other or further notice is required.  A reasonable opportunity to object and be heard

regarding the relief requested in this motion has been afforded to parties in interest, namely, RWI.

        D.      RWI's objection to the sale has been resolved in the preceding analysis.

        E.      The Trust has good, valid, and marketable title to all of the Trust Property.

        F.      Consistent with the judgment of the Trustee, the Court finds and concludes that the most effective and orderly way of selling the Trust Property is by a bidding and public auction process approved by the Court consistent with 28 U.S.C. §§ 2001-2004, as provided herein.

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE COURT HEREBY ORDERS**:

        1.      <u>Motion Granted.</u>  The Sale Motion is granted in all respects.

        2.      <u>Objections Overruled.</u>  All objections to the Sale Motion or the relief requested herein that have not been withdrawn, waived, or settled, including all reservations of rights included therein which are not otherwise provided for by the order are overruled on the merits.

        3.      <u>Sale by Auction – Bidding Procedures.</u>  The Trustee is hereby authorized to sell the Trust Property through a competitive bidding and auction process, in a single sale, to the party submitting the highest and best bid for the Trust Property, subject to the approval of the EPA, at a closing to follow the auction, pursuant to the following Bidding Procedures.

        4.      <u>The Sale Process</u>:

        a.      <u>Information About and Access to the Trust Property.</u>  Any party that is interested in bidding on the Trust Property may contact the Trustee for information regarding the Trust Property, the EPA removal action, and for reasonable access to the Trust Property for inspection.

b.    Notice of Auction.  After entry of the Sale Order, the Trustee will cause a Notice of Property for Sale, Bidding Procedures, and Auction (the "Notice") (attached hereto as **Attachment 2**) to be served by first-class mail, postage prepaid, facsimile, electronic transmission, hand-delivery, or overnight mail upon (a) all persons reasonably known to have expressed an interest in a transaction with respect to the Trust Property during the past twelve (12) months, and (b) the EPA.  In addition, the Trustee will distribute a copy of the Sale Order and Notice to all parties the Trustee believes, in his discretion, qualify as a potential bidders based primarily upon likely interest in the Trust Property and financial ability to consummate the Sale.  Finally, the Trustee will advertise the proposed sale in *The Daily Herald*, a newspaper of general circulation in Utah County, once weekly for a period of four weeks.  The Bid Deadline shall be fourteen days following the final advertisement described above.

c.    Reserve Price.  The sale of the Trust Property will be subject to a reserve auction price of **$425,000** (the "Reserve Price"), below which the purchase will not be consummated.

d.    Qualified Bids. Any party interested in acquiring the Trust Property must be a Qualified Bidder who submits a "Qualified Bid" in conformance with the following procedures at or prior to the Bid Deadline.  To constitute a Qualified Bid, a bid must be received by the Bid Deadline and:

1)    contain a signed definitive purchase agreement (the "Purchase Agreement") substantially in the form attached hereto as **Attachment 3**, which recognizes that no representations or warranties are made by the Trustee other than as to title, a purchase price of at least the Reserve Price, an earnest money

deposit in the amount of $25,000 to be held in trust pending the Auction and Sale, and not being subject to any financing contingency;

2)     be submitted so that it is received on or before the Bid Deadline to the following:

> Bret F. Randall
> Durham Jones & Pinegar, P.C.
> 111 East Broadway, Suite 900
> Salt Lake City, UT  84111

e.     <u>The Auction</u>

1)     <u>Trustee Conducts Auction</u>.  In the event that the Trustee receives more than one conforming Qualified Bid before the Bid Deadline, the Trustee will conduct an auction (the "<u>Auction</u>") proposed to start on the fifth business day following the Bid Deadline with respect to the Sale of the Trust Property at the time and place set forth in the Notice based on the schedule set forth in this Sale Order. In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder and shall be required to comply with the requirements of the Bidding Procedures and to submit a bid that is timely and that complies in all respects with the Bidding Procedures. At the Auction, Qualified Bidders may submit successive bids in increments of at least $10,000 greater than the prior bid (the "<u>Incremental Bid Amount</u>") for the purchase of the Trust Property until there is only one  offer that the Trustee determines is the highest and/or best offer (the "<u>Successful Bid</u>").  If only one Qualified Bid shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Trust Property will be sold to the party making the sole Qualified Bid, subject to approval by the EPA, which sole Qualified Bid shall be deemed the Successful Bid.  All bids made at

the Auction shall remain open until the earlier of the end of the second business day following the closing of the transaction;

2)    <u>Highest and/or Best Bid</u>.  At all times during the proposed sale process, the Trustee shall retain full discretion and right to determine, in consultation with the EPA, which bid constitutes the highest or otherwise best offer for the purchase of the Trust Property, and which bid should be selected as the Successful Bid, if any.  Without limiting the generality of the foregoing, the Trustee may reject any bid that, in the Trustee's sole discretion, the Trustee determines is (i) inadequate or insufficient, (ii) contrary to the requirements of the proposed sale process, or (iii) contrary to the best interests of the Trust or the EPA. The Trustee may adopt additional rules for the Auction that, in his judgment, will better promote the goals of the Auction and that are not inconsistent with any of the other material provisions hereof or of any Court order.

3)    <u>Sale Implementation</u>.  Upon determination of a Successful Bid, the Trustee will execute and deliver the Purchase Agreement submitted by the successful bidder and will be authorized to take all commercially reasonable and necessary steps to close and implement the transaction contemplated by the Successful Bid, including the preparation of appropriate closing documents.

4)    <u>Sale to Next Highest Bidder if the Sale to Successful Bidder Does Not Close</u>.  Following the Auction, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest bid received by the Trustee at the Auction, if

any, will be deemed to be the Successful Bid and the Trustee will be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the next highest bid without further order of the Court. In such case, the Trustee specifically reserves the right to seek all available damages from the defaulting Successful Bidder.

f.     <u>Sale Free and Clear</u>. Upon settlement, the transfer of the Trust Property to the purchaser shall be free and clear of liens, encumbrances, and options, thereon and there against, including such interests specifically listed in **<u>Attachment 4</u>** attached hereto (but subject to the specific interests listed in **<u>Attachment 5</u>** attached hereto). The transfer of the Trust Property shall not subject the purchaser to any liability with respect to any obligations incurred in connection with, or in any way related to the Trust Property, prior to the date of settlement or by reason of such transfer under the laws of the United States, any State, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor liability. The Trustee or the purchaser may record a copy of this Sale Order in the real property records of Utah County.

g.     <u>Sale Without Representation or Warranty</u>. The Trustee's conveyance of the Trust Property shall be shall be without representations or warranties of any kind, nature, or description by the Trustee or his agents, except as to title. All of the Trust Property shall be transferred "as is," "where is," and "with all faults," and no provision in a proposed agreement to the contrary will be enforceable. The Trustee may include in his notice the following disclaimers: THE TRUSTEE EXPRESSLY DISCLAIMS ANY

WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY PORTION OF THE REAL PROPERTY OR ANY IMPROVEMENTS, INCLUDING, WITHOUT LIMITATION, KNOWN OR UNKNOWN ENVIRONMENTAL CONDITIONS RELATING TO THE TRUST PROPERTY.

  h. <u>Schedule</u>. The sale will be conducted pursuant to the following schedule:

  1) As the date for the Trustee to complete service of the Notice (as defined below), not later than fourteen business days from the date of the Court's entry of this Sale Order, except that notice by publication will be accomplished by weekly publication in a newspaper of general circulation in Utah County, where the Trust Property is located, for a period of four weeks. The published notice will identify the Trust Property and summarize requirements for Qualified Bids and the Auction.

  2) As the Bid Deadline, the date which is not later than thirty calendar days from the date of completion of service and publication of the Notice. The notice shall specify the Bid Deadline.

  i. As the date for the Auction, if necessary, the fifth business day following the Bid Deadline.

  5. <u>Court Approval of the Sale</u>. This Sale Order authorizes the Trustee to sell the Trust Property to the Successful Bidder without further approval by the Court; *provided*, however, that if any issues arise warranting further Court consideration, the Trustee may seek entry of one or more orders in aid of the sale.

6.     <u>Powers of Trustee</u>.  The Trustee is authorized and directed to execute and deliver, and empowered fully to perform under, consummate, and implement, the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the sale of the Trust Property and to take all further actions as may be reasonably requested by the purchaser for the purposes of assigning, transferring, granting, conveying, and conferring to the purchaser any or all of the Trust Property.

7.     <u>Distribution of Trust Property Sale Proceeds.</u>  Proceeds of the sale will be distributed as set forth in the Trust Agreement, as follows:  First, payment of the reasonable costs of sale as approved by the EPA, including the unpaid administrative costs of the Trust; second, payment to the Trustee of 10% of gross sales price of the Trust Property; third, payment to the EPA of proceeds until the debts and obligations owing to the EPA are paid in full, and fourth, if any proceeds remain, payment to other secured creditors, if any, in the order of their priority in the Trust Property.

IT IS SO ORDERED.

DATED this 24th day of October, 2017.

BY THE COURT:

CLARK WADDOUPS
United States District Judge